arguments not to exceed 15 minutes per side. Mr. Hall for the appellant. Good morning, Judge Keith, Judge Clay, Judge McKee. It's good to be in Cincinnati, Ohio, this morning. I'm Andrew Hall of the Morton County Bar. I'd like to reserve four minutes for the appellant, Judge McAllister, to present his argument. For rebuttal. I'm representing Perry Marsh in his habeas corpus petition. This is really a simple case, but you know they all are when you look at it from our side. This is a case where Mr. Marsh was convicted of second degree murder, abuse of a corpse, and tampering with evidence in the death of his wife, Janet Marsh. The problem arises is that Janet Marsh's body has never been found. There was never any direct evidence presenting that Perry, that she's even dead, except for some testimony from Perry Marsh's father and one jailhouse snitch. The other evidence that came into the trial that indicated any... Sort of minimize that. Why would not the father's testimony that he saw her body and helped dispose of it be direct evidence? Well, because if you, and I'm sure you read the briefs, the father testified that when he went up to get the body some 40 something days, at least 40 days after the disappearance, that he tried to pick it up to carry it down a little hill. You're right. So let me ask the question a slightly different way, although I don't think this is central to what you want to argue today. He says his son told him where these remains were. Yes. Granted, there's an argument about what was really in the plastic bag, I get that. But the son says, here's where you're going to find these remains. He goes there, they're there, and the son says, this is my wife. So, strong evidence, isn't it? But, that is. But you have to go with the credibility of the father. The father testified that he tried to pick up the body to carry it down the embankment to the cart, that it was so heavy he couldn't pick it up, that it weighed between 50 and 70 pounds, and that he knew that because he had tried to lift 50 pound bags of dog food of the same weight, that he had to drag it down the hill. The problem with that scenario is that Dr. Bass, the state's, for instance, pathologist, who's probably the world's preeminent pathologist there, has a body for him in Knoxville, testified that under the conditions that existed at the time, middle Tennessee, it being summer, August, into September, during that 40 days, the body being in a black plastic bag with one end open, and very just covered up, not actually buried, that it could not have been, by that time, anything but a skeleton, and that it would have weighed approximately 10 to 15 pounds. So, then we have to ask, Perry Marsh, remember, he was under indictment too. He was facing eight years in prison, made a deal to get two years, if I remember, for his testimony. So, although he's the father, he's got things to cover for himself too, and so that's what we point out is the problem with his testimony. The other thing about the father's testimony that's interesting is it's the only testimony about how she died, in this case, other than what was drug out of, microagent drug out of my client, what my client blew out, was that my client said that she died in an accident. So, how do you go from an accident to second degree murder, based on that testimony, unless you get into this other testimony, where my client, as you know, ran at the mouth, insistently, on the airplane ride from Los Angeles. He was arrested in Mexico. He was brought back to Los Angeles. Two detectives picked him up in Los Angeles, brought him to Nashville. And the interesting thing about that, that makes it egregious to me, is, first place, they knew he was a representative by lawyer. They didn't admit that. They never read him in the Miranda Rights. However, Sergeant Postolano did say, we are not going to question you. We're not going to interrogate you. We're not going to take a statement. And you feel free, if you want to tell us anything, to tell us anything you want to. And that's it. That's a long way from saying, oh, by the way, anything you tell us can and will be used against you in court of law. That's sort of like your neighbor saying, you feel free to come to my house and borrow my lawnmower any time you need it. And then you go to the house to get the lawnmower, and he shoots you when you go in the garage. He forgot to tell you that part, that he was going to get you for breaking into his house. That's what they did. They said, you feel free to tell us anything. We're not going to take a statement. We're not going to interview you. We're not going to do anything. You just feel free to tell us anything. Well, starting with that, what's the matter with that? What happened next might be a different question. I got that. But what was incorrect or inaccurate under Supreme Court law in the statement that you just said the police officer made? Well, he implied that he didn't need his Miranda warnings because it wasn't going to be used against him anyway. Feel free to tell us anything. Feel free to talk to us. Is there a case that says that you can't say to somebody, I'm not going to ask you any questions, but feel free to talk to me? Moulton does. Moulton does. It doesn't have to be the direct evidence of questioning to get the evidence you're wanting, but it can be indirect or by the method that the officer is operating. Well, we're going to get to different things that the police officer said after this one. I'm just curious about your starting with this one because I don't see anything that's inaccurate legally in what he said initially. Well, it's the way that he used it later. He came back later and used it with the district court and certified that. Found that that was a violation of his limit rights. Then, of course, you go on and compound that with the jailhouse stuff. Once he got to Nashville, Davidson County, of course, the incriminating stuff that he said to the officer was that he would like to make a deal. I'd like to make a deal as soon as we get there. I don't want to wait until Monday. This is Friday night. I don't want to wait until Monday. I want to do it tomorrow if you can get ahold of the DA or assistant DA, I believe he was talking about. I'd like to make a deal where I could plead for a murder that takes five to seven years. Then he went on to say that before this he had never been involved in any criminal activity. Things are devastating when the jury hears that. From what all they've known up to that point is that this lady's missing. Then all of a sudden he's saying I never involved in any criminal activity before this. I'd be willing to make a deal five to seven years to murder. That came in in the trial. Then when he got to the jail is where he really ran off with the mouth. But at the jail he was also represented by counsel. The officer who transported your client, was that actually an interrogation? He was there to transport your client. Then your client just starts talking. If he's not interrogating him and it's not an interrogation, does he still have to give the Miranda? Yes, it doesn't have to be interrogation. But it can be making statements or using a situation to the extent where you know you're going to get evidence or you're hoping to get evidence and you don't advise them of their rights. He knew he was represented by counsel. He gave me his lawyer's business card, in fact. They never read him randomly. You didn't have any reason to think your client was starting to discuss the case, did he? The crime was removed in time and place and he's just transporting the man. He said this, so he made this statement to him after Mr. Marr started running his mouth. Mr. Marr started asking about the evidence in the case. Did you get anything other than circumstantial evidence? You got any witnesses? Was there something new that came up? This is why you got me indicted nine years later? This sort of thing. He started asking those kinds of questions. And then that's when he was told, well, we're not going to interrogate you and we're not going to take a statement and so forth here today, but you feel free to tell us anything if you want to. You feel free to tell us. But if you feel free to tell something, you feel like there's going to be no repercussion. You're almost saying either any time the police and a defendant are in contact with each other for any reason, you have to give Miranda. There's no case that says that. No. Or you're saying that once he started to talk, then they had to give a Miranda warning that says, boy, you really shouldn't keep talking without a lawyer, and I can't find any case that says that. The situation is that from what the officer told him, it's clear that he knew or suspected that this man is fixed to tell some stuff. And he tells him in a way that makes it okay. He says, you know, just feel free. We're not going to interrogate you. We're not going to take a statement. We're not going to do anything like that. But you feel free to tell us anything you want to tell us. If you feel free to tell somebody something, then you're not going to suffer any repercussions for it. You know, that's the common way of looking at things and accepting that terminology. You feel free to go ahead and talk. We're not going to do anything. We're not going to take a statement. We're not going to do anything. So feel free to talk to us. Then the jail was, I've got 32 seconds. The jail was the egregious part. We read the brief where he just really talked. In jail they hooked up a fellow in the cell next to him who was facing 90 years in prison with a wire, and he talked about witness elimination and getting rid of the Levines, killing them, so that he could have a 90% chance of winning if they were not there. He'd have a 40% chance if they were there. The things of that nature was really incriminating. And again, he had a lawyer. He was not read and ran the rights. That's my time wrap. All right. Thank you. Good morning. May it please the court, Nick Spangler on behalf of the respondent warden, Gerald McAllister. The question before this court is not whether it would have admitted the petitioner's statements to Pastiglione and Ferris in the first instance. The question before this court is whether the state's court decision was unreasonable in light of clearly established federal law as established by the United States Supreme Court. Here, the Tennessee Court of Criminal Appeals' rejection of the petitioner's Fifth and Sixth Amendment claims was not contrary to any U.S. Supreme Court decision, and it did not involve any unreasonable application of any U.S. Supreme Court decision. But even this unreasonable application inquiry is not determinative in this case, because the petitioner's statements to Pastiglione and Ferris were certainly harmless, given the petitioner's admissions to at least four other trial witnesses of his own guilt. Those witnesses are, in sum, as the court discussed earlier, Arthur March, who testified at trial that the petitioner said the victim died as a result of an accident after they had an argument. The father also testified that he helped the petitioner dispose of the victim's body, and he testified that he helped him destroy important computer evidence. Beyond that, we have the testimony of Jose Pulido, an attorney from Mexico, who testified that the petitioner threatened him and another business associate during a business deal by saying that he would do away with them the way he did away with his wife. Beyond that, we have two other fellow inmates, Cornelius King and Reno Martin, and with regard to Cornelius King, he testified at trial that the petitioner said he killed the victim by hitting her in the head with a wrench after she accused him of infidelity. This manner of death was further corroborated by the repairman's testimony that the petitioner provided him with a set of pliers to fix a leaky faucet in the victim's home just hours before her disappearance. By comparison to these four admissions of guilt, the petitioner's statements to Postiglione were equivocal at best. Postiglione testified at trial that during their trip from L.A. to Nashville, the petitioner denied killing the victim, and that was admitted during the trial through Postiglione's testimony. The petitioner's statements to Postiglione about seeking a plea deal were not necessarily inconsistent with discussions in which an innocent person might engage for their own best interest in just seeking a favorable plea deal. The petitioner's disclosure to Postiglione that he had specific knowledge about the case went no further than that undetailed declaration. Similarly, the petitioner's statements to Ferris about his plan to kill the victim's parents did not necessarily establish his guilt of the underlying murder offense that's at issue in this case. Thus, the admission of the petitioner's statements to Postiglione and Ferris did not have a substantial injurious effect on the jury's verdict, given the minimal impact of those statements during the petitioner's lengthy trial, and in comparison to his other admissions of guilt to these four other trial witnesses. And so even if this court determines that the state court did unreasonably apply some Supreme Court decision, it should still affirm because the petitioner's admitted statements to Postiglione and Ferris were undeniably harmless. But in any event, I'll try to focus on the claims that the appellant focused on in his argument, and those are primarily the Fifth Amendment claim with regard to Postiglione, as well as the Sixth Amendment claim with regard to Postiglione. The Tennessee Court of Criminal Appeals' rejection of the petitioner's Fifth Amendment claim regarding his statements to Postiglione did not involve an unreasonable application of clearly established law, because those statements were not the product of interrogation or its functional equivalent. That is, they were not reasonably likely to follow from any conduct by Postiglione. Postiglione's conduct did not amount to the petitioner's complaint that he did not receive complete Miranda warnings is irrelevant because the threshold issue here is interrogation or its functional equivalent. And this court, I believe as recently as 2011, has acknowledged that that is a threshold inquiry before we even get to Miranda, is whether or not the petitioner was subject to interrogation. Under the Supreme Court's decision in Innis, the interrogation inquiry has three components. First, the reasonable expectations of the police. Second, the perceptions of the accused. And third, the individual susceptibilities of the accused or the lack thereof. Postiglione's conduct during the trip was not reasonably likely to elicit an incriminating response from the petitioner. At the outset, he advised the petitioner of his right to remain silent and said that he did not intend to take any statement from the petitioner. After initially advising these two things, Postiglione asked the petitioner no questions and only responded after the petitioner initiated conversation. As appellant acknowledges, the petitioner was running off at the mouth. It was the theme throughout this case. He did it in jail, he did it during this trip. The petitioner was simply running off at the mouth. Beyond that, Postiglione refused to discuss the evidence or engage in plea negotiations despite the petitioner's repeated attempts to gain information about the case and his repeated attempts to secure a favorable plea deal. Postiglione declined to discuss any case-specific subject matter either related to that evidence or the plea deal. And in this context, Postiglione's open-ended offer to answer questions at the outset of the trip did not amount to interrogation for two reasons. One, the offer did not encourage any discussion specifically about the underlying murder offense. And two, the offer did not result in any contemporaneous statement by the petitioner, much less an inculpatory contemporaneous statement. I believe after that initial open-ended offer to either listen to the petitioner or answer questions, some 45 minutes went by before the petitioner said anything and when he finally did say something, nothing that came out of his mouth was inculpatory. The inculpatory information came out significantly later. Thus, the petitioner cannot demonstrate that his statements were the product of words or actions by the police, Postiglione in this case. Innis also deemed a suspect's perception central to the determination of whether an interrogation occurred. Indeed, the case law, including Innis, focuses on the petitioner's perception as the primary consideration. And here the petitioner made his perceptions readily apparent when at the end of their trip from Los Angeles to Nashville, he looked at Postiglione and said, we're just two men having a cordial conversation. Beyond that, he went on to thank Postiglione and the other detective for their fair and reasonable treatment during the trip. So I think that provides adequate insight into what the petitioner's perceptions of this whole interaction were. Finally, Innis also deemed a suspect's individual susceptibilities and the police's knowledge of those susceptibilities relevant in determining whether or not an interrogation occurred. And this is where the petitioner's background and experience as an attorney comes into play. It certainly doesn't come into play once we get beyond the interrogation inquiry and we question whether or not Miranda rights were adequately given. But in this threshold inquiry of whether or not we have interrogation, certainly it's relevant because it reflects an insusceptibility to any alleged interrogation tactics. The petitioner was a former attorney and Postiglione knew this. And he was undeniably familiar with his Miranda rights, including his right to remain silent. He had asserted his Fifth Amendment privilege against self-incrimination no fewer than 70 times in a related civil proceeding. And he waived his Miranda rights in 1996 after full admonishment. And then following that, he gave a written statement about the victim's disappearance. Thus, the petitioner's knowledge and training as a former attorney and his previous experience asserting his rights is relevant to this initial inquiry. So given Postiglione's intent, the petitioner's perceptions, and the petitioner's training and experience in the law, the state court reasonably decided this Fifth Amendment claim against him. Moving on to the Sixth Amendment claim, which admittedly, the facts are intertwined with the Fifth Amendment claim. The Tennessee Court of Criminal Appeals' rejection of the Sixth Amendment claim also did not involve an unreasonable application of clearly established federal law because those statements were not the product of this time deliberate elicitation by Postiglione. Just as interrogation is the threshold inquiry for the petitioner's related Fifth Amendment challenge, deliberate elicitation is the relevant inquiry for his Sixth Amendment challenge. But contrary to the district court's finding, Postiglione did not deliberately elicit information from the petitioner. And he also did not intentionally create or knowingly exploit a situation likely to induce an incriminating response. In that regard, the general circumstances of the petitioner's chaperone transport do not demonstrate any inherently coercive or exploitive situation. And neither the district court nor the petitioner have identified any authority to the contrary, as Your Honor pointed out. Indeed, the guarded transport was simply a practical necessity for bringing the petitioner back to the jurisdiction of his crimes. Indeed, a situation that the petitioner created by fleeing to Mexico and then being in California after his extradition. Thus, the particular circumstances of the petitioner's transport were no more exploitive or compulsive than that inherent with the circumstances of custody itself. That the district court found deliberate elicitation based on the Feller's decision is perplexing given the distinguishing circumstances of that case. In Feller's, the police surprised the suspect at his home, confronted him with a warrant for his arrest, and told him they were there to discuss his involvement with the methamphetamine distribution, the charges that they had just confronted him with. The police began naming Feller's co-defendants when referring to his involvement with these individuals, at which point certainly Feller's gave incriminating responses regarding his involvement with these individuals. Finding that the police deliberately elicited information from Feller's at his home, the Supreme Court specifically emphasized the fact that when they initially confronted him, they said that their purpose for being there was to discuss his involvement for the crimes in which he was charged. In contrast with Feller's, Postiglione initiated communication by advising the petitioner of his right to remain silent and telling him that he did not intend to obtain any statement. He asked the petitioner no questions about the case and responded only when the petitioner initiated conversation. Despite the petitioner's repeated and opportunistic attempts to gain information, Postiglione declined to discuss evidence and declined to engage in any unauthorized plea negotiations on behalf of the district attorney's office. Thus, Postiglione did not deliberately elicit information from the petitioner and the state court reasonably concluded so much. To the extent that the district court found otherwise, certainly this court's standard of review is de novo and certainly the court is entitled and should rule a different way. But in any event, even if this court determines that the state court unreasonably applied the relevant Supreme Court decisions, it's not determinative because again, we have the harmless error analysis whereby the petitioner admitted to four other witnesses, admitted his guilt to four other witnesses. Finally, I'll touch on the Sixth Amendment claim with regard to Ferris. The Tennessee Court of Criminal Appeals rejection of the Sixth Amendment claim regarding Ferris also did not involve an unreasonable application of clearly established federal law because those statements pertain to an uncharged offense for which the right to counsel had clearly not attached. Petitioners relied on the Moulton decision as well as the First Circuit decision in Bender to argue two points throughout this case. One, that all of Tennessee's state and federal courts  and two, that the state has been dishonest and even sanctionable for taking a legal action in a legal position contrary to his. But the petitioner relies on Moulton without acknowledging the distinguishing circumstances of that case. The petitioner's reliance on the First Circuit's decision in Bender is also misplaced because that case did not arise under 2254. In other words, that court considered as a matter of first impression and under de novo review whether or not they would have admitted the statements. On the other hand, this court is constrained to affirm unless the state court's rejection of the Sixth Amendment claim was unreasonable. Clearly, the state court's determination was not unreasonable in light of the relevant Supreme Court decisions in Moulton, McNeil, and Cobb. And getting to the facts of the Moulton decision, which was decided in 1985, the facts are readily distinguishable. In Moulton, Moulton and his co-defendant were charged with several theft offenses where after the Moulton retained counsel. After that, the government arranged with the co-defendant, he agreed to a plea deal whereby he would wear a wire and record his discussions with Moulton during a meeting where they were going to discuss their trial strategy with regard to the already pending theft offenses. During that meeting, the co-defendant frequently asked Moulton to remind him about their involvement and the facts of the underlying theft charge, which was already pending. And of course, the recording consisted of what the Supreme Court called prolonged discussion of the pending charges, including what actually occurred and what the state's evidence would show. Accordingly, the Supreme Court found a Sixth Amendment violation stemming from the government's deliberate elicitation and stated that because the statements were related to the pending theft charges, they should have been excluded. But here, unlike in Moulton, Ferris did not elicit any statements from the petitioner regarding the underlying murder offense. He only elicited statements regarding the uncharged conspiracy offense, which clearly the right to counsel had yet to attach because no formal charges had been filed. And again, given the offense-specific rule in McNeil, which came out about six years later, McNeil basically states that the Sixth Amendment right to counsel does not attach until the formal commencement of charges. And here, we didn't have the commencement of charges in the conspiracy until well after this case was over. Thereafter, in Cobb, about a decade later, the Supreme Court decided that McNeil, decided, it was about a decade after they decided McNeil, and they affirmed that the Sixth Amendment right to counsel is offense-specific and cannot be invoked once and for all for all future prosecutions. Finding that Moulton created no exception to McNeil's offense-specific rule, the Cobb Court emphasized the egregious circumstances in Moulton, again, emphasizing the fact that the discussion between Moulton and his co-defendant regarded trial strategy for the already pending theft charges. Accordingly, the Cobb Court deemed Cobb's reliance on Moulton misplaced and puzzling given the McNeil decision which came out several years later and established the offense-specific rule. Here, the petitioner's statements to Ferris pertained only to the uncharged conspiracy offense, did not pertain to the charged murder offense. Thus, the Sixth Amendment right to counsel had not attached and the Tennessee Court of Criminal Appeals reasonably decided so much. Well, they did relate to the pending charge, at least obliquely, did they not? Because he said something, do I recall correctly, he said something to the effect of if he could get rid of these witnesses, the chances of beating the current charge went from X to Y. To be honest, I don't recall that specific portion of the testimony, but certainly there's the argument to say that the conspiracy charges were not irrelevant to this case. Certainly they wouldn't have been admitted unless they're relevant and they certainly were indicative of a guilty mind. But the difference is, given the offense-specific rule announced in McNeil, they just did not pertain directly, as they did in Moulton, to the underlying pending charge of murder. Even if there were some statement about elimination of witnesses being pertinent to the underlying case, I don't believe there was a reference to the murder case or the facts underlying that murder case. So certainly we feel that this case is distinguishable from Moulton. But in any event, falling back on the harmless error argument, not to beat a dead horse, but again, we had these four other admissions to other trial witnesses, so even if this court determines that there was some unreasonable holding pursuant to the relevance of the Supreme Court case law, Moulton, McNeil, and Cobb, we fall back on the harmless error argument. We argue that there was no substantial injurious effect on the jury's verdict. I believe I'm out of time, so unless the court has further questions, we'd ask that you affirm the judgment of the district court. Thank you. Thank you. Mr. Bottle? It's interesting that the state doesn't recall the pertinent facts of the recording at the jail. The facts were that the officer testified that when they put the wire on this cellmate next door, that they were hoping to get information that would be pertinent to the criminal murder trial. They were trying to get information that he was trying to do witness elimination in the murder trial. They knew that if they could prove that he was trying to kill witnesses in the murder trial, they would use that in the murder trial. It doesn't take, you know, a scientist to figure that out. You know, they put the wire on the cellmate next door. He discussed many things. Mr. Marsh talked and talked and talked. I can't excuse him for that, but he did run it to mouth. But he did say that he needed to eliminate the Levines because he would have a 90% chance of winning the murder trial if they were not there, and his chances fell to 40% if they were there. So... I think the interesting part about this is surely you can't criticize the police for wiring up the inmate in the cell next door in connection with the plot to kill other people. No. That's okay, right? No, that's fine. They could use it in that later case, which they did. And it'd be okay to use it in the other case. Yes, they did. He got 24 years for that. No complaining about that. Right. So... if the reason that they did it and the purpose for which they did it are okay, it just does seem a little odd to then say, but gee, you can't use it at all in this case. Well, it's not odd if there's a case that says that. To be honest with you, it just slipped my mind just as I said that. But... uh... that... if you're taking evidence for a crime that you think has been committed, a simple way of explaining it, and the fellow's already charged with the crime, and they kind of interlap... Let me say it another way. If you send a person with a wire in to talk about the crime that's already been committed, I get that. Can't use it. Under some circumstances. But when you're investigating a new crime for which no charges have been filed, the fact that it also gets to be used in the pending case doesn't seem to run afoul of any Supreme Court case. It does. If you give me a second, I've still got a minute, 15 seconds. I probably helped... I probably didn't bring it. But if you... In our briefs, we covered it a couple, three different times. That if you're case X and case Y, and X is already ongoing, and he's got counsel and so forth, and you're investigating potentially case Y, and you pick up evidence, you can go ahead and use it in case Y. But you can't come back and use it on X because he had counsel, and you should have advised his attorney or at least had him an opportunity to waive the right to counsel. I thought that was a case of first impression in the Sixth Circuit. We don't have any cases. And that the Supreme Court hasn't spoken to that. I'm wrong? Then let's speak of it now. Pardon me? Then let's speak of it now. Sometimes we have to use... But this is an AEDPA case. We don't get to make it up. Sometimes we have to interpret the cases. We have to look at... That was a case. You're right. Now I remember. The Sixth Circuit case, and that's why we used it. You know that. First impression. Okay. Thank you. And the case is submitted.